IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM McGUIRE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 04 C 6097 |
| vs. ) | |
| ) | Magistrate Judge Morton Denlow |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on the Plaintiff's motion for summary reversal and the Defendant's motion for summary judgment. Plaintiff, William McGuire ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of his request for Social Security Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"), should be reversed or remanded because the decision contains errors of law and is not supported by substantial evidence. For the reasons stated below, this Court grants Plaintiff's motion for summary reversal, denies the Commissioner's motion for summary judgment, and remands the case back to the Commissioner for a further hearing.

### I. BACKGROUND FACTS

#### A. PROCEDURAL HISTORY

Claimant filed an application for DIB and SSI on January 11, 2002, alleging a disability since September 18, 2001, due to an injury to his left arm and depression. R. 57-

59, 73, 399-401. These applications were denied initially, R. 27-31, 403-07, and on reconsideration. R. 34-7, 409-12. On February 18, 2004, Administrative Law Judge John Mondi ("ALJ"), held a hearing on the question of disability. R. 413-46. The Claimant was represented by counsel and brought his mother to testify. In addition, GleeAnn L. Kehr, a vocational expert, also testified. R. 440-44.

On April 29, 2004, the ALJ issued his decision and determined that Claimant was not disabled because he has the residual functional capacity for medium work and could perform a significant number of jobs in the economy. R. 13-22. On July 23, 2004, the Appeals Council denied the Claimant's request for review. R. 5-7.

The Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1). The Court conducted an oral argument on May 19, 2005, and announced the decision from the bench. This opinion amplifies the Court's reasoning.

## B.   HEARING TESTIMONY – FEBRUARY 18, 2004

### 1.   Claimant's Testimony

At the time of the ALJ hearing, the Claimant was forty-eight years old and single. R. 418. He has a ninth-grade education and has taken some college courses but never received a GED. *Id.* The Claimant worked as a painting contractor and decorator for 25 to 30 years. R. 419. Following a biking accident on September 18, 2001, the Claimant has not held

2

gainful employment. R. 418. Claimant, who is right handed, alleges his disability is due to an injury to his left arm above the wrist and due to depression. R. 73, 421.

After his accident he performed various household maintenance tasks. R. 419. Prior to his most recent surgery in January, 2004, he felt comfortable lifting 5-10 pounds, but following his surgery, he is now apprehensive of lifting a cup of coffee with his left hand. R. 421.

Claimant testified to a long history of emotional problems for which he was treated and medicated. R. 421-22. He does not have a good appetite and his birds are his only companions. R. 423-24. He has problems with alcohol that he believes he has overcome. R. 424. His left arm is atrophied and deformed and the constant pain leaves him edgy. R. 429. He anticipates further surgeries. R. 432. He is being treated by a psychiatrist for panic disorder and takes psychiatric medications. R. 431-32. He is very confrontational in dealing with people, he loses his temper, and has made a suicidal gesture. R. 432-33.

### 2. Barbara McGuire - Claimant's Mother

The Claimant's mother, Barbara McGuire, testified that Claimant is very depressed, confrontational, and that he threatened to kill her more than once. R. 438. He complains daily about pain. R. 439.

### 3. GleeAnn Kehr – Vocational Expert ("VE")

GleeAnn Kehr, a vocational expert ("VE"), also testified regarding Claimant's job prospects. R. 56, 440-45. The ALJ asked the VE to consider a hypothetical individual of the Claimant's same age, education, work experience, mental capacity, and physical limitations

in order to determine whether the Claimant could perform work. R. 441-42. The VE testified that such an individual would be able to perform 2,000 jobs as an usher, 2,000 jobs as a ticket taker, and 4,000 jobs as a general clerk. R. 442-43. Next, the ALJ asked the VE to fully credit the Plaintiff's testimony regarding his own physical and mental limitations. R. 443. Here, the VE concluded that the Claimant would be precluded from working due to his unpredictable behavior with others and to the period of recovery from multiple surgeries. *Id.*

## C.  MEDICAL EVIDENCE – WRIST INJURY

### 1.  Dr. Daniel J. Nagle – Treating Orthopedic Surgeon

On September 18, 2001, the Claimant sustained a multifragmented open fracture of his left radius and ulna while bicycling in Italy. R. 119, 284-93. He was hospitalized in Italy and upon re-entry into the United States went to the emergency room. R. 119-22.

Dr. Daniel J. Nagle, M.D., a surgeon specializing in the hand and upper extremity treated Claimant's injury. Claimant was seen initially on September 27, 2001. He suffered from an open fracture of the left distal radius and ulna for which he underwent an open reduction with internal and external fixation. At this point the wound was grossly contaminated. X-rays demonstrated multiple pins in place. Examination revealed possible infection and the wrist was held in a position of a significant amount of ulnar deviation and flexation. Dr. Nagle noted that the injury was very serious and further intervention would

likely be required and posttraumatic arthrosis would result. R. 232-35. Treatment and physical therapy continued. R. 228-31.

On October 10, 2001, Claimant underwent an operative procedure to adjust the external fixator. R. 226. Treatment, therapy, and antibiotic adjustment continued through November 12, 2001. R. 219-25.

On November 12, 2001, Claimant underwent another operative procedure for removal of the external fixator, and removal of both buried and superficial wires. R. 217. The following day, x-rays showed that the fracture was very severe and that the lunate fossa might be totally obliterated. The distal radiolunar joint was somewhat widened but the ulnar styloid fracture appeared to be healing. R. 216. Twice weekly therapy continued. R. 211-15.

On December 4, 2001, Dr. Nagle recommended continued therapy two to three times a week, although it was difficult to say what would ultimately happen with the wrist. R. 210. Therapy continued. R. 201-10. On January 8, 2002, there was aching in the wrist as well as definite deformity and swelling. The decision regarding wrist fusion would not be made for one year; in the meantime therapy continued, although Claimant noted constant pain and swelling of the wrist. R. 199-200. On February 21, 2002, Dr. Nagle noted that significant pain continued, that wrist fusion would probably be scheduled in the summer, and that Claimant's intent to ski without using his left hand would not pose a significant danger. R. 196-97. In April Dr. Nagle noted that the fractures were consolidating and that fusion

surgery could occur only after Claimant had been infection free for six months. Follow-up and therapy continued through September, 2002. R. 191-95.

An examination by Dr. Nagle on September 13, 2003, revealed a significant extrinsic tightness. In order to improve function, Dr. Nagle recommended an extensor tenolysis. X-rays demonstrated that the ulna had healed. The carpus and distal radius were translocated radially and the shaft of the radius may have fused into the triquetrum and lunate. R. 189-90.

On November 11, 2002, the Claimant underwent extensor tenolysis surgery[1] in order to improve the range of motion in his fingers. R. 273-74, 277. He went to physical therapy sessions until December 23, 2002, when he told his therapist that he had extreme pain in his left wrist. R. 260-62, 265-71. On December 31, 2002, Dr. Nagle reported that his surgery had revealed a significant amount of pathology and could not determine whether the Claimant's problems with his wrist were due to a worsening wrist condition or were simply part of the recovery process from the tenolysis surgery. R. 259. Dr. Nagle recommended that treatment for depression occur and that an eventual fusion would have to be considered. *Id.*

On February 23, 2003, Dr. Nagle determined that the Claimant's distal radius fracture had healed, but in a significantly maligned position, and that Claimant continued to present with a malunion of his distal radius with exuberant callous formation of the ulna. R. 277.

On May 27, 2003, Claimant noted increasing pain and reported many personal problems. Fluoroscopy demonstrated malalignment. A CT scan was recommended. R. 305.

---

[1]Tenolysis surgery releases a tendon from an adhesion. *Stedman's Medical Dictionary.* (27th ed. 2000).

The CT scan showed nonunion of the ulnar and radial fractures, osseous impingements and displacements as well as severe synovitis and severe tenosynovitis. R. 303-04. In June 2003, Dr. Nagle recommended an August surgery. R. 302. Another CT scan in July 2003 demonstrated nonunion of the distal radial metaphysis with significant shortening of the radius. R. 298. At that point Dr. Nagle explained the significant risks of the surgery and Claimant did not wish to proceed. R. 297.

By December, 2003, the Plaintiff had returned from a week of bike riding 400 miles in Jamaica and stated that he could tolerate the discomfort, but was more concerned about getting the wrist better aligned and getting rid of the pain along the ulnar side of the wrist. R. 328. Dr. Nagle then recommended a distal ulnar dissection to improve the appearance of the wrist, but the Claimant would likely lose all motion in his wrist. The Claimant had this surgery in January, 2004, and he began therapy. R. 329-31. On January 27, 2004, Dr. Nagle indicated that the Claimant was doing well after surgery and that the Claimant was able to fully supinate and pronate, which was a significant improvement compared to his preoperative situation. R. 327. The X-rays showed no instability of the distal ulna and there did not appear to be any abutment of the ulna against the wrist.

### 2. Dr. Robert T. Patey – State Agency Physician

On October 17, 2002, Dr. Robert T. Patey, a state agency physician, opined that the Claimant could lift 50 pounds occasionally and 25 pounds frequently, and that he had no limitations in sitting, standing, walking, pushing or pulling. R. 250-57. However, his fine manipulation was limited to no more than fingering occasionally with the left hand. R. 253.

## D. MEDICAL EVIDENCE – MENTAL HEALTH

### 1. Dr. Stephen Cann

From February 12-18, 2002, the Claimant was admitted to Westlake Hospital Department of Psychiatry. R. 128-30. He was diagnosed with a depressive disorder and alcohol abuse. R. 128. On three additional occasions (October 23, 2000, October 20, 2001, and March 23, 2002), Dr. Stephen Cann treated the Claimant. R. 165-68. Dr. Cann diagnosed the Claimant with major depression, alcoholism and marijuana dependence and prescribed Paxil. R. 167.

### 2. Dr. Ann Walczynski - Consultative Psychiatric Exam

Claimant underwent a consultative psychiatric examination on April 22, 2002 with Dr. Ann Walczynski. He complained of insomnia, feeling hopeless and helpless, having low self esteem, poor energy and motivation, irritability, poor frustration tolerance and difficulties with concentration and memory. R. 170. He helped with basic house chores, but socialized only with family and had no friends. R. 171. Dr. Walczynski noted that Claimant appeared sad and anxious. Dr. Walczynski diagnosed Claimant with bipolar disorder, depression, and alcohol abuse and dependence in early, full remission. R. 171-72.

### 3. Erika Altman, Ph. D. - State Agency Medical Consultant

On May 6, 2002, a state agency medical consultant, Erika Altman, Ph.D., reviewed the Claimant's health record and concluded he was only moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and in his ability to accept instructions and respond appropriately to

criticism from supervisors. R. 174-75. He was not significantly limited in the other areas of concentration and persistence or social interactions or in any areas of understanding and memory or adaptation. *Id.* Dr. Altman noted that Claimant's activities of daily living were not significantly impaired and his mental status was unremarkable, and he was capable of simple, routine tasks. R. 176.

### 4. Dr. Bulbul Bahuguna, M.D. - Psychiatrist

On May 15, 2003, Claimant went to the emergency room at Northwestern Memorial Hospital claiming depression and suicidal ideation. R. 338. He was admitted at Northwestern Evanston for 14 days and discharged with a diagnosis of major depression and alcohol abuse, and his Global Assessment of Functioning Score upon discharge was 65.[2] R. 365. During his hospitalization, Dr. Bulbul Bahuguna, M.D., a psychiatrist, treated him. On February 5, 2004, Dr. Bahuguna noted that the 2001 accident exacerbated the Claimant's depressive symptoms and diagnosed panic disorder and agoraphobia. R. 364. Dr. Bahuguna opined that because of his mental illness, the Claimant was unable to work and was disabled. *Id.* Claimant was taking Lexapro and Ativan. *Id.*

## E. THE ALJ'S DECISION

On April 29, 2004, the ALJ rendered his decision. R. 13-22. The ALJ made twelve discrete findings: (1) Claimant met the non-disability requirements for a period of disability

---

[2]Indicating the Claimant had suffered only mild symptoms of depression and could generally function and hold meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders*, pg. 32 (4th ed. 1994).

9

and DIB on September 18, 2001, ("onset date") and continued to be so insured through the date of decision, (2) Claimant has not engaged in substantial gainful activity since the onset date, (3) the Claimant has impairments that are severe–depression, histories of left arm fractures and possible alcohol abuse, (4) Claimant does not have a medically determinable impairment that meets or exceeds a listing impairment, (5) Claimant's testimony regarding his limitations was not credible, (6) Claimant has the residual functioning capacity for medium work subject to a limitation against more than occasional fingering with the left hand, (7) Claimant is unable to perform his past relevant work, (8) Claimant is a "younger individual", (9) Claimant has "a limited education", (10) Claimant has no transferrable skills from any past relevant work, (11) there are a significant number of jobs in the Chicago-metro area that the Claimant can perform including usher, ticket-taker, and general clerk, and (12) the Claimant is not under a "disability" as defined by the Social Security Act at any time through the decision date. R. 21-22.

## II. LEGAL STANDARDS

### A. STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). Under such circumstances, the decision reviewed by the district court is the decision of the ALJ. *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir.

1993). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A mere scintilla of evidence is not enough. *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.     DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income benefits, ("SSI"), are available to "disabled indigent persons" under Title XVI of the Social Security Act, ("Title XVI"). *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Titles II and XVI of the Social Security Act employ the same definition of "disability." *Id.* That is, an individual is disabled if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB and SSI only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart*, 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a

severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. DISCUSSION

Claimant raises three issues for review: (1) whether the ALJ failed to find a listing level impairment, (2) whether the ALJ properly considered and discussed Claimant's treating psychiatrist's opinion that Claimant was disabled, and (3) whether the ALJ failed to consider the non-exertional limitations imposed by a severe mental impairment. The Court will now address each of these issues in turn.

### A. THE ALJ FAILED TO PROPERLY ANALYZE THE ISSUE OF WHETHER CLAIMANT'S CONDITION MET LISTING 1.07

At the hearing before the ALJ, Claimant's counsel argued that Claimant's condition constituted a listed impairment because there were a series of surgeries that met the listing. R. 444. In addition, the Claimant specifically referenced Listing 1.07 in his request for review to the Appeals Council. R. 10-11. Listing 1.07 and Section 1.00M require:

> *Fracture of an upper extremity* with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App 1 § 1.07. Section 1.00M indicates:

> *Under continuing surgical management*, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts

13

directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy."

*Id.* at 1.00M

The ALJ addressed the issue of the listed impairment as follows:

The medical evidence does not establish that claimant's impairments meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4, including Sections 1.00 for musculoskeletal disorders and 12.00 for mental disorders. While counsel has argued that claimant's left arm impairment is of listing level severity since non-union was not obtained, the record does not show a series of staged surgical procedures within a 12 month period or a pursuit of treatment consistent with disabling limitations. Furthermore, claimant's activities that have included cycling abroad for extended periods are not indicative of a disabling condition. Nor were his statements and the physician's finding prior to his recent surgery which appears to have been at least in part prompted by cosmetic concerns.

R. 17-18.

In *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004), the Seventh Circuit recently discussed the steps an ALJ must perform where a party raises a claim under step three, wherein a claimant proceeds under a theory of presumptive disability if he has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d), 20 C.F.R. Pt. 404, Supt. P, App. 1. In considering whether a claimant's condition meets or equals a listed impairment, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668; *but see Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) ("As to [Claimant's] argument that the

ALJ's failure to explicitly refer to the relevant listing alone necessitates reversal and remand, we have not yet so held, and decline to do so here.").

In the case at bar, the ALJ neither discussed the listing by name, nor engaged in an appropriate analysis of listing 1.07. The onset date of Claimant's alleged disability was September 18, 2001. CT scans performed in May and July, 2003, some 20 to 22 months after the initial injury, demonstrated nonunion of both the ulnar and radial fracture and other problems. R. 298, 303-04. Surgeries and surgical treatment were performed on October 10, 2001, R. 226, November 12, 2001, R. 217, November 11, 2002, R. 189, and on January 21, 2004, R. 329. The Court does not understand the ALJ's statement that the "record does not show a series of staged surgical procedures within a 12 month period ..." Claimant's surgeries continued both within and outside the 12 month period.

The Commissioner's reliance on the medical opinion rendered by the state agency physicians is also misplaced because the state agency physicians did not have all of the relevant medical information. On May 9, 2002 and October 17, 2002, after Claimant had undergone three surgeries, state agency physicians reviewed the evidence of record and indicated on a Disability Determination and Transmittal Form that Claimant did not meet or equal any of the listings. R.25-26. These determinations are generally sufficient for an ALJ to rely upon. *See* 20 C.F.R. § 404.1526(b) (noting that medical opinions rendered by state agency physicians may be considered in determining whether a claimant meets or equals a Listing); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) ("These [Disability Determination and Transmittal forms] conclusively establish that consideration by a

physician...designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.") (citations and internal quotations omitted); Social Security Ruling 96-6p ("[S]tate agency and medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."). However, in this case, the state agency physician made the determination that the Claimant did not meet a listing before two subsequent surgeries.

After the date of these reports, the Claimant underwent two additional surgeries to address "significant pathology," R. 259, and to address the "significantly misaligned position" and nonunion of the fractures. R. 277, 298, 329. As a result, the state examining physicians did not have before them all of the necessary medical information. For this reason the case must be remanded to the ALJ to further consider and to articulate his rationale at step 3 and to consider whether he wishes to consult a medical expert or to send the complete medical records to a state agency physician.

## B. THE ALJ FAILED TO ADDRESS AND EXPLAIN WHY HE DID NOT AGREE WITH CLAIMANT'S TREATING PSYCHIATRIST.

Claimant's treating psychiatrist, Dr. Bahuguna, opined that because of his mental illness, Claimant was unable to work and was disabled. R. 364. Dr. Bahuguna did not provide any specific mental limitations, but only generally indicated that Claimant was disabled. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and if

consistent with substantial evidence in the record. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see* 200 C.F.R. § 404.1527(d)(2). An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, so long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). In this case, the Court is left to wonder why the ALJ rejected Dr. Bahuguna's opinion because there is no discussion of Dr. Bahuguna in the ALJ's decision. Therefore, this case shall be remanded for further consideration of this issue.

## C. THE ALJ PROPERLY CONSIDERED THE CLAIMANT'S MODERATE LIMITATIONS IN SOCIAL FUNCTIONING IN HIS HYPOTHETICAL TO THE VE.

Although the case is being remanded to the ALJ, the Court will address an issue raised on appeal that may resurface on remand. The ALJ found that the Claimant has the severe impairments of depression and residuals of left arm fractures. R. 17. The ALJ recognized that reviewing state agency physicians concluded that Claimant "had moderate limitations in the abilities to perform activities within a schedule, maintain regular attendance, and to be punctual with customary tolerances and to accept instructions and respond appropriately to supervisors" and he was capable of performing "routine tasks". R. 19.

Claimant argues that the ALJ failed to consider his nonexertional limitations. Specifically, Claimant points out that the ALJ, without explanation, incorporated only some of the limitations found in the assessment of Dr. Altman into his hypothetical question, but failed to include a limitation to simple routine tasks continued in that same assessment. Pl's

17

Br. at 13. Claimant also argues that the ALJ disregarded Dr. Altman's additional determination that Claimant had moderate limitations in social functioning. Pl's Br. at 14, referring to R. 176, 246.

Dr. Altman, reviewed the record and at step three concluded that Claimant met the Part A criteria of Listing 12.04, but regarding the Part B criteria, Claimant had only mild restrictions of activities in daily living, mild difficulties in maintaining concentration, persistence, or pace, only one or two repeated episodes of decompensation, and moderate difficulties in maintaining social functioning. R. 236-46. Dr. Altman indicated that an RFC assessment was necessary, as Claimant did not meet any of the mental Listings. R. 236. In a mental RFC assessment, Dr. Altman opined that Claimant was only moderately limited in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances and accept instructions and respond appropriately to criticism from supervisors. R. 174-75. Dr. Altman concluded that Claimant's activities of daily living were not significantly impaired and his mental status was unremarkable, and he was capable of simple, routine tasks R. 176.

There was no error by the ALJ in not including a general limitation regarding moderate difficulties in social functioning (which Dr. Altman found at step 3), since the ALJ did include the more specific limitations identified by Dr. Altman in her mental RFC assessment. Specifically, in the hypothetical question posed to the VE, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work experience as Claimant who had moderate limitations in his ability to perform activities within a schedule,

maintain regular attendance, be punctual within customary tolerances and respond appropriately to criticism from supervisors (and who would not lift over ten pounds and was unable to fully rotate the left wrist). R. 441-42. Therefore, the ALJ's questioning of the VE was proper.

## IV. CONCLUSION

**For the reasons set forth in this opinion, Claimant's motion for summary reversal is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Commissioner for further proceedings consistent with this opinion.**

**SO ORDERED THIS 7th DAY OF JUNE, 2005.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies Mailed To:**
Deborah Spector
H. Thomas Lenz
Spector & Lenz, P.C.
20 East Jackson, Suite 1650
Chicago, Illinois 60604-2203

Counsel for Plaintiff.

Shefali B. Baltz
Special Assistant United States Attorney
200 West Adams Street, 30th Floor
Chicago, Illinois 60606

Counsel for Defendant.